UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Malachi Kilgore,

Plaintiff,

v.

John King and Keri Gerlicher,

Defendants.

Civil No. 13-0634 (JRT/FLN)

**REPORT AND RECOMMENDATION**

---

Malachi Kilgore, *Pro se*.
Jackson Evans, Assistant Attorney General, for Defendants.

---

**THIS MATTER** came before the undersigned United States Magistrate Judge on the parties' cross motions for summary judgment (ECF Nos. 18 and 35). The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1. For the reasons set forth below, the Court recommends that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED.**

## I. BACKGROUND

Plaintiff Malachi Kilgore is an inmate in the custody of the Minnesota Department of Corrections (DOC). Kilgore filed a *pro se* complaint on March 20, 2013, alleging violations of 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. 2000cc et seq. (RLUIPA). Compl. 6-7, ECF No. 1. In general, Kilgore argues that the DOC has improperly designated his religion, the Nation of Gods and Earths (NGE) as a Security Threat Group (STG) and that such a designation violates his right to freely exercise his religion under the First Amendment and RLUIPA. *Id.* Kilgore seeks compensatory and punitive monetary damages, as well as injunctive relief in the form of removing the STG designation. *Id.* at 7.

**A. Kilgore's background.**

Kilgore is currently serving a 396 month sentence for murder in the second degree and has been in DOC custody since 2002. McComb Aff., Ex. A, ECF No. 38. Thus far, Kilgore has spent the majority of his detainment at the Oak Park Heights and Stillwater Minnesota Correctional Facilities (MCF-OPH and MCF-STW, respectively). *Id*. Ex. C. Since June 27, 2012, Kilgore has remained incarcerated at MCF-STW. *Id*.

**B. The Nation of Gods and Earths and the 5 percenters.**

Kilgore is a practicing member of the NGE. Evans Aff., Ex. C at 6-7, ECF No. 37 (hereinafter, "Kilgore Dep.").[1] NGE was founded by an individual identified as Clarence 13X. *Id*. at 19-20. According to Kilgore, NGE is one of 73 sects of Islam. *Id.* at 21. However, NGE distinguishes itself from other sects of Islam based on how members of the NGE religion see themselves in relation to God. *Id.* NGE members view themselves as one with God; contrastingly, non-NGE Islamic sects perceive God as a distinct entity from themselves. *Id.* NGE is a monotheistic region, viewing Allah as the supreme being. *Id*. at 8. NGE members believe that all individuals can potentially achieve enlightenment, but that currently only five percent of the world's population has reached an enlightened state. *Id*. at 9. Thus, the NGE is intertwined with a group called the 5 percenters and individuals who practice NGE sometimes refer to themselves as "5 percenters." *Id*. at 47 (Kilgore referring to individuals practicing NGE as 5 percenters).

NGE members have flexibility in how they choose to practice their individual spirituality, as the group does not distinguish between priests and laymen. *Id*. at 24-25. Three separate texts

[1] The page numbers associated with Kilgore's deposition refer to the internal deposition page numbers, not the CM-ECF page numbers of the larger Evans Affidavit.

comprise the teachings of NGE: the 120 Lessons, the Supreme Alphabet and the Supreme Mathematics. *Id.* at 25. NGE members use the 120 Lessons as a guide to living a spiritually righteous life, studying the text as Christians study the Bible. *Id*. at 25-26. Members accurately study the 120 Lessons by using the Supreme Alphabet (a set of letters from A-Z) and the Supreme Mathematics (a set of numbers from 0-9) as guides. *Id*. at 28-29. In other words, by studying the Supreme Alphabet and Supreme Mathematics, NGE practitioners are better able to comprehend the 120 Lessons. *Id.*

Kilgore specifies that the practice of the NGE faith consists of five main activities: (1) studying; (2) exercising; (3) maintaining a proper diet; (4) meditating; and (5) participating in building or parliament. *Id.* at 32.The studying component consists of members reading, studying, and memorizing the 120 Lessons and the Supreme Alphabet and Mathematics. *Id*. The tenet of exercise mandates that NGE practitioners maintain good health by refraining from drugs and alcohol and participating in physical exercise. *Id*. at 33. In order to achieve a proper diet, NGE members restrict intake of drugs, alcohol, and "pork."[2] *Id*. at 35. In order to mediate, an NGE practitioner engages in activity similar to prayer where the individual looks inside themselves to better understand God. *Id*. at 34. Finally, "building" is comprised of discussing the Supreme Mathematics and building upon an individual's knowledge of a principle or number. *Id*. at 38. Building does not require a group of members, as a practitioner may build with one's self. *Id*. at 39. Parliaments are NGE group services during which individuals come together to build. *Id*. at 40. Parliament is traditionally held at 2:30 p.m. on Sundays, although in actuality it can be held any day of the week.

---

[2] "Pork" is a generic term for poisonous foods that individual NGE members identify as it pertains to his or her own spirituality. Kilgore Dep. at 35.

*Id*. at 40-41. The practice of Parliament does not consist of standardize rituals. *Id*. at 43.

## C. The DOC and Security Threat Groups.

### 1. STGs generally.

In general, the DOC claims that members of STGs disproportionately contribute to prison violence and participate in acts related to organized criminal activity, such as smuggling and extortion of other inmates. Rothstein Aff.¶ 4, ECF No. 39. The DOC defines an STG as a group that has at least three members nationally; this definition does not mean that there must be three or more STG members within the DOC system. *Id.* ¶ 7. It is the DOC's policy to label any group an STG if (1) another resource has classified a group as an STG (such as another state's department of corrections, the federal bureau of prisons, or another law enforcement agency) and (2) the DOC has identified at least one member of that STG within DOC custody. *Id*.¶ 8. The DOC utilizes a set criteria in order to determine that an individual is a member of an STG, including, but not limited to, whether that inmate has STG paraphernalia, tattoos, or has self-identified as such. *Id*.¶ 6. If an inmate engages in three or more of the identified criteria within a year, the DOC considers that inmate an "active" STG member. *Id*.

The DOC contends that early identification of STGs is a crucial component of maintaining penological security because such monitoring allows the DOC to prevent and reduce the proliferation of STGs. *Id*.¶ 9. The DOC further argues that "[i]f the DOC was required to wait until a group had committed identifiable acts of violence in furtherance of the group prior to labeling that group as an STG, the safety of DOC offenders, staff and visitors would be compromised." *Id*. Likewise, the early labeling of an STG prevents an increase of contraband within the DOC system, which in turn assists in reducing offender violence related to STG paraphernalia. *Id*. ¶ 10. Minnesota

Department of Corrections Division Directive 301.110 governs the DOC's use of STG designations and states that "[a]s STG activity and paraphernalia threaten the security of the facility, all such behavior and items are prohibited. Possession of any clothing or property associated with an STG, or any communication or actions related to STG affiliation, is prohibited and may result in discipline. " *Id.*, Ex. B.

**2. Five percenters and NGE as STGs.**

Since 1999, the DOC has labeled the group known as the five percenters as an STG. *Id*. ¶ 16. According to the DOC, the five percenters is a typical STG in that the organization uses signs, symbols, and paraphernalia to recruit individuals. *Id*.¶ 14. Currently, the DOC identifies the five percenters as "somewhat unique in the way that they try to use the religion known as the Nations of Gods and Earths to legitimize themselves, to recruit members and to spread." *Id*. ¶ 15. No act of violence has occurred within the DOC that is attributed to this group. *Id*.¶ 16. The DOC states that this lack of violence is the direct result of labeling the group as an STG and withholding STG contraband. *Id*.

**D. DOC's religious practice policy.**

DOC policy generally permits inmates to practice individual religious convictions in a variety of ways. ECF No. 38 ¶ 8. Specifically, inmates can engage in group religious services, keep up to five personal religious items in one's cell, order and wear religious items, receive specialized visits for religious counseling purposes, and maintain religious dietary restrictions. *Id*.

Each DOC facility has a Religious Resources Center (also known as the Chapel) which offers meeting space for group services. *Id*.¶ 9. DOC policy mandates that in order for a religious group to receive group space time within the Religious Resources Center, the group must have at

least eight inmate members. *Id*. ¶ 11. Furthermore, group services require supervision by an outside "religious resource volunteer."*Id*. ¶ 13. The DOC states that there is intense demand for space within the religious resource center, as the vast majority of MCF-STW's 1,600 inmates hold religious beliefs. *Id*. ¶¶ 10, 14.

Inmates who practice religions that are not eligible for group worship in the Religious Resource Center can independently practice their religions. *Id.* ¶ 15. An inmate may attend a group service of another religion he most identifies with and may receive personal religious counseling visits in addition to normal visitation hours. *Id*. The DOC does not condone proselytizing activities as "[a]llowing offenders to proselytize would likely lead to discord and conflicts as some offenders may resent what they perceive to be as someone forcing a religion on them." *Id*. ¶ 16.

**E. Kilgore's individual practice of NGE.**

Kilgore has achieved enlightenment and refers to himself as a god. Kilgore Dep. at 8. Kilgore remains the only NGE member incarcerated at MCF-STW or within the entire DOC system. *Id*. at 6-7. According to Kilgore, there are eight other non-offender NGE practitioners within the state of Minnesota. *Id*. at 10.

While incarcerated at MCF-STW, Kilgore reports that he sufficiently maintains his dietary restrictions. *Id.* at 35. Further, DOC policy provides Kilgore with 3-5 hours of outside cell time each day, allowing him to participate in exercise activities. ECF No. 38 ¶ 21. However, Kilgore is unable to conduct Parliament services within the Religious Resource Center. *Id*. at Ex. I. The DOC maintains that this restriction is pursuant to the "neutral" DOC policy which prohibits religious group meetings unless the religion has a requisite number of members. *Id*. Kilgore states that he is able to build "everyday" by speaking with other inmates and that, prior to initiating the instant

lawsuit, he had non-offender NGE members on his visitation list. Kilgore Dep. at 44, 57.

The DOC admittedly confiscated three five percenters newsletters sent to Kilgore over the course of the last year (from January 2013 to January 2014). ECF No. 38 ¶ 20. Kilgore states that he specifically needs three newspapers—the "Son of Man" newsletter, the "5%er" newsletter, and the "Cream City" newsletter—in order to stay sufficiently in tune or "calibrated" with the practice of NGE. Kilgore Dep. at 46-48.

**F. Procedural and grievance history.**

Kilgore filed a previous lawsuit relating to this same issue in 2011. *See Kilgore v. Gerlicheri*, 11-CV-2571. However, Kilgore agreed to voluntary dismissal of the lawsuit in order to facilitate the exhaustion of his administrative remedies. *Id*. at ECF No.44.

After dismissal of his first case, Kilgore commenced an internal prison grievance on October 14, 2012, requesting that the DOC remove the STG label and that he be allowed to possess NGE materials. ECF No. 38, Ex. D. On November 16, 2012, the religious practice committee denied Kilgore's request. *Id*. ¶ 3.Kilgore appealed the outcome of that grievance to the DOC central office in December 2012. *Id.*, Ex. F. Defendant Assistant Commissioner John King subsequently issued a ruling on that appeal, stating that Kilgore may maintain copies of the Supreme Mathematics, Supreme Alphabets, and 120 Lessons. *Id*.

Kilgore responded to the appeal outcome by sending two letters to Assistant Commissioner King in February 2013, in which he again requested that King remove the STG label and additionally argued that he was unable to receive the texts which had been previously granted during the appeal process. *Id*., Ex. G-H. Although the record is unclear as to the exact date, at some point in March 2013, Associate Warden Mary McComb attempted to personally furnish Kilgore with

copies of the central texts. *Id*., Ex. I; Kilgore Dep. at 14. On March 15, 2013, Assistant Commissioner King responded to Kilgore that Associate Warden McComb "is attempting to furnish the items to you" and that the STG designation would remain in effect for the NGE. ECF No. 38, Ex. I. This letter additionally affirmed that Kilgore was allowed visitation from non-offending NGE members, but stated that Parliament activities could not take place due to a lack of NGE membership. *Id*. Later, at his deposition, Kilgore stated that he "made a mistake" in refusing the central texts and offered that he "would take [the central texts] right now if I can get them." Kilgore Dep. at 14, 17. Subsequently, Kilgore was sent the Supreme Alphabet and Supreme Mathematics on January 6, 2014. ECF No. 37-1, Ex. A**.**

## II. STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or establish "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III. ANALYSIS

### A. Individual or Official Capacity.

All of Kilgore's substantive claims arise under 42 U.S.C. § 1983, which provides:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the depravation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

In order "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). A plaintiff may bring suit against a defendant government actor in either individual or official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (distinguishing between personal and official capacity suits under § 1983).

Before addressing the merits of Kilgore's claims, it is first necessary to decide whether the claims are brought against Defendants in their individual or official capacities. Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Id*. at 165. Suits brought against a state actor in his or her official capacity should be "treated as a suit against the State." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Contrastingly, a successful individual capacity claim will impose liability on a government official for actions taken by that individual while acting under the "color of state law." *Id*.

Here, Kilgore's complaint specifically frames his lawsuit as one brought against the Defendants in their individual capacities, stating "[t]hat each Defendant, being that their being sued in the *individual* capacity, reimburse the Plaintiff his $700.00 ($350.00 x 2) for the previous petition & this one and compensate Plaintiff $10,000 for violating his constitutional rights ($10,000 a piece)." ECF No. 1 at 7 (emphasis added). The Complaint is silent as to official capacity claims. *See*

*generally*, ECF No. 1. In Kilgore's response to Defendants' answer, he asserted that "Defendants are being sued under their individual capacities, NOT their official capacities. . . ." Pl.'s Resp. to Ans. ¶ 5, ECF No. 13 (emphasis in original). Similarly, in Kilgore's motion for summary judgement, he specifies that "[t]his suit was brought in the Defendant's INDIVIDUAL CAPACITY." Mot. for Summ. J. 2, ECF No. 18 (emphasis in original).

Kilgore, as a *pro se* litigant, is entitled to a reasonably liberal construction of his complaint. *See e.g., Ailshire v. Darnell*, 508 F.2d 526, 528 (8th Cir. 1974) (stating that *pro se* civil rights complaints are entitled to liberal construction). This judicial construction, however, should not be extended to create an interpretation that directly contradicts the express indications made by a plaintiff. *See Bracken v. Dormire*, 247 F.3d 699, 703 (8th Cir. 2001) ("[D]istrict courts must be as mindful as the appellate courts to adjudicate on the merits only those claims that the prisoner properly raises and to avoid those issues that have not been properly raised."). Accordingly, the Court reads Kilgore's complaint as asserting only individual capacity claims against Defendants.

**B. RLUIPA Claim.**

Kilgore raises a statutory free exercise claim under RLUIPA. RLUIPA states that "no government shall impose a substantial burden on the religious exercise of an inmate unless the government demonstrates that the imposition of the burden (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Native American Council of Tribes v. Weber*, 750 F.3d 743, 748 (8th Cir. 2014) (internal quotations and citation omitted).

Pursuant to Congress's Spending Power, RLUIPA only permits a cause of action against parties that receive federal funding. *Brooks v. Roy*, 12-CV-316, 2014 WL 127024, at * 16 (D. Minn.

Jan. 14, 2014) (citing *Nelson v. Miller*, 570 F.3d 868, 888-89 (7th Cir. 2009)). As such, a plaintiff cannot bring a § 1983 individual capacity claim under RLUIPA because individual DOC employees do not directly receive federal funding. *Sharp v. Johnson*, 669 F.3d 144, 153-55 (3d Cir. 2012); *Stewart v. Beach*, 701 F. 3d 1322, 1333-1335 (10th Cir. 2012); *DeMoss v. Crain*, 636 F.3d 145, 151 (5th Cir. 2011); *Nelson*, 570 F.3d 868, 889 (7th Cir. 2009); *Smith v. Allen*, 502 F.3d 1255, 1271-75 (11th Cir. 2007), *abrogated on other grounds by Sossamon v. Texas*, 131 S. Ct. 1651 (2011); *Brooks*, 2014 WL 127024, at *16; *Jihad v. Fabian*, 09-CV-1604 (SRN/LIB), 2011 WL 1641885, at *8 (D. Minn. Feb. 17, 2011). Thus, Kilgore's RLUIPA claim fails as a matter of law, and Defendants' motion for summary judgment on this claim should be granted.

**C. First Amendment Claim.**

Kilgore alleges that his right to freely exercise his NGE religion pursuant to the First Amendment was violated by the DOC's STG designation. "Although prisoners retain their constitutional rights, limitations may be placed on the exercise of those rights in light of the needs of the penal system." *Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979, 982 (8th Cir. 2004). Thus, constitutional claims that would normally be evaluated under a strict scrutiny standard if raised by a nonprisoner plaintiff are assessed "under a lesser standard of scrutiny" within a prison setting. *Id.*

In evaluating a Free Exercise Clause claim, the Court examines (1) whether the challenged government action interfered with a sincerely held religious belief and (2) whether the government interference was "reasonably related to legitimate penological interests." *Gladson v. Iowa Dep't of Corr.*, 551 F.3d 825, 831 (2009). This second reasonableness prong is determined by applying the four "*Turner* factors" as set out by the Supreme Court in *Turner v. Safley*, 482 U.S. 78, 89-90 (1987). These factors include (1) whether there is a rational connection between the policy

restriction and the legitimate government objective used to justify it; (2) whether alternative avenues of exercising the right remain open to the inmate; (3) whether accommodation of the inmate's request will have an adverse impact on guards, other inmates, or prison resources; and (4) whether ready alternatives to the restriction exist. *Id.* Furthermore, the Eighth Circuit has held that, as a threshold matter in a Free Exercise First Amendment claim, a prisoner plaintiff must demonstrate that the prison placed a "substantial burden" on the inmate's ability to practice his religion. *Gladson*, 551 F.3d at 833; *Patel v. United States Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008). If a prisoner does not produce sufficient evidence that he was substantially burdened in practicing his religion, then the court need not apply the *Turner* factors to the plaintiff's Free Exercise claim. *Gladson,* 551 F.3d at 833.

Here, Defendants do not contest the sincerity of Kilgore's religious beliefs. Defs.' Mem. in Supp. of Summ. J. 13, n. 2, ECF No. 36. Thus, two questions remain related to Kilgore's First Amendment Free Exercise claim: (1) whether Defendants substantially burdened the practice of Kilgore's religion; and, if Kilgore satisfies this threshold showing, (2) whether the restrictions Defendants enacted are reasonably related to legitimate penological interests as determined by the *Turner* factors.

**1. Substantial Burden.**

In order to establish that a prison regulation substantially burdens the practice of an inmate's religion, the regulation must:

> significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

*Murphy*, 372 F.3d at 988 (quoting Weir v. Nix, 114 F.3d 817, 820 (8th Cir. 1997)).[3]

Here, Kilgore has failed to establish an adequate showing of substantial burden. According to Kilgore, the central components of the NGE religion are study, physical exercise, meditation, diet, and building (which includes the activity of group services, known as Parliament). Kilgore Dep. at 32. Kilgore generally argues that the STG label on the five percenters substantially burdens his ability to practice the NGE religion, specifically emphasizing that (1) he is unable to legally receive the NGE's mandatory tenets or texts, (2) he is prohibited from receiving outside NGE resources such as newsletters and periodicals, and (3) he is prevented from holding weekly and monthly services in the prison chapel. ECF No. 18 at 5. The Court shall address each policy stemming from the STG designation in turn.

**a. Possession of central texts.**

According to Kilgore, in order to successfully fulfill the study component of the NGE religion, a member must study the central texts of NGE, which include the Supreme Mathematics, Supreme Alphabet, and 120 Lessons. ECF No. 37-1, Ex. C at 32. To the extent Kilgore argues that

---

[3] The Court notes that what constitutes a substantial burden differs amongst Free Exercise and RLUIPA claims. Since the Eighth Circuit articulated the substantial burden standard in *Murphy*, the Supreme Court has specified that RLUIPA prohibits inquiry into whether a belief or practice is a central tenet of an inmate's religion. *Cutter v. Wilkinson*, 544 U.S. 709, 725 (2005). Because of this distinction, the Eighth Circuit has found that the portion of the *Murphy* standard requiring an examination of whether a religious belief is fundamental to an inmate's religion is not applicable to a RLUIPA claim. *Gladson*, 551 F.3d at 833. However, since Kilgore's RLUIPA claim fails for the reason noted above, the Court will evaluate this aspect of the *Murphy* substantial burden standard as it pertains to Kilgore's First Amendment claim.

he is unable to study due to not possessing the central text, the argument fails.[4] ECF No. 18 at 2.

The record indicates that the DOC attempted to furnish Kilgore with the central texts. Although the record is unclear as to the exact date, at some point in March 2013, Associate Warden Mary McComb attempted to personally furnish Kilgore with copies of the texts. ECF No. 38, Ex. I; Kilgore Dep. at 14. Kilgore does not dispute this fact, explicitly acknowledging in his deposition that he refused to take possession of the texts from Warden McComb when she offered them.[5] Kilgore Dep. at 14, 17-18. Additionally, at his deposition, Kilgore stated that he "made a mistake" in refusing the central texts and that he "would take [the texts] right now if I can get them." *Id*. at 14, 17. Subsequently, Kilgore was sent the Supreme Alphabet and Supreme Mathematics pursuant to his request on January 6, 2014. ECF No. 37-1, Ex. A.

The DOC offered, and Kilgore initially refused, the central texts. Kilgore cannot now argue that the DOC "significantly inhibited or restrained" his mandated practice of studying those materials when it was his affirmative choice to deny possession of the central texts. Moreover, the record indicates that Kilgore is now in actual possession of his desired texts and thus, the argument appears moot. Hence, Kilgore failed to raise a genuine issue of material fact in regards to the"study"

---

[4] To the extent Kilgore argues that he can obtain the central texts but chooses not to due to fear of discipline, this argument will addressed *infra* in section "d."

[5] A relevant portion of Kilgore's deposition reads as follows:

Q. And it is—John King has informed you in writing that you can possess these materials; is that correct?
A. Yes.
Q. And you are not in possession of these materials now; is that correct?
A. Yes.
Q. Is the reason that you're not in possession of these because you did not take possession from Ms. McComb?
A. Yes.

Kilgore Dep. at 14.

tenet of his faith being substantially burdened.

**b. Receiving outside newsletters and periodicals.**

Kilgore additionally maintains that his religious practice is substantially burdened because he is unable to receive materials with NGE and five percenters designations through the prison mail system. Indeed, prison officials admit to confiscating three issues of a fiver percenters newsletter between January 31, 2013 and January 31, 2014. ECF No. 38 ¶ 20. Kilgore specifically references three publications (1) the "5%ers" newsletter, (2) the "Son of Man" newsletter, and (3) the "Cream City" newsletter and maintains that deprivation of these items substantially burdens his NGE practice. Kilgore Dep. at 49. Defendants emphasize that, according to Kilgore, he does not need the periodicals to sufficiently practice NGE and, therefore, withholding these periodicals could not possibly place a substantial burden on Kilgore's practice of NGE. ECF No. 36 at 21.

The Court agrees with Defendants. The record indicates that a ban on these newsletters does not substantially burden Kilgore's NGE practice. By Kilgore's own admission, the fact that Kilgore does not receive the desired publications does not impede Kilgore's ability to actually *practice* his religion.[6] Kilgore Dep. at 47. Rather, Kilgore states that the newsletters allow him to calibrate his NGE observance with other practitioners or members. *Id*. Calibration is not a central tenet of NGE, as described by Kilgore. *Id*. at 32.

Moreover, even if calibration was a fundamental tenet of NGE, the record shows that Kilgore

---

[6] A relevant portions of Kilgore's deposition reads as follows:

Q. Okay. The hard thing that I'm trying to understand and I don't feel like you've explained to me, though, is how the newspaper affects your exercise of religion, because it sounds to me like–

A. It doesn't.

Kilgore Dep. at 54.

can calibrate with NGE members through alternative channels. Specifically, DOC policy permits Kilgore to meet with general visitors and also to receive additional one on one pastoral visits. ECF No. 38 ¶ 15. Commissioner King specifically noted in a letter to Kilgore that he was "permitted to have visitation with other non-offender NGE practitioners." *Id*., Ex. I. In fact, Kilgore admitted to previously having NGE members on his visitation list, but noted that he removed these individuals for the purpose of this lawsuit. Kilgore Dep. at 57. The Court concludes that Kilgore has not raised a material issue of fact in relation to his argument that the STG label substantially burdens his religion by preventing calibration—Kilgore has ample alternative opportunity to communicate and calibrate his practice of NGE with outside NGE members.

**c. NGE services.**

Kilgore further contends that his practice of NGE is substantially burdened because he is not allowed to hold Parliament within MCF-STW's Religious Resource Center or Chapel.

Kilgore identifies Parliament as group services where individuals come together to build upon their knowledge, using the Supreme Mathematics as a guide. *Id*. at 40. According to Kilgore, Parliament is a type of building activity. *Id*. The DOC currently prevents Kilgore from utilizing space within the Religious Resource Center due to the fact that policy mandates that at least eight inmates belong to the religious group seeking to use the space. ECF No. 38, Ex. I. However, Kilgore has not made the requisite threshold showing of substantial burden as it relates to this policy because he admits to practicing the tenet of building in other ways. Tellingly, Kilgore reports that he does not need to engage in Parliament activity because he already has "the knowledge" and the purpose of parliament is to "enlighten the masses" or non-NGE members. *Id*. at 56. Moreover, when asked if Kilgore engages in building activities with non-NGE members at MCF-STW, Kilgore responded

that he does this everyday by talking to other non-NGE inmates. *Id*. at 44. Thus, to the extent NGE requires members to build with other non-members, Kilgore is not substantially burdened because he engages in this activity on a daily basis.

**d. Ripeness issues.**

In addition to the foregoing, Kilgore also argues that he could potentially be disciplined under DOC policy for engaging in NGE activities (such as keeping central texts or communicating with other NGE members) because of the STG designation. ECF No. 1 at 7; ECF No. 18 at 3; ECF No. 24 at 2. To the extent Kilgore claims that he cannot freely exercise his religion due to the mere *possibility* of discipline, the argument fails on ripeness grounds.

Article III's ripeness doctrine prohibits a plaintiff from bringing a premature claim. Ripeness must be established in order "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging party." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967). The Supreme Court has specified that a ripeness evaluation turns on (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Id*. at 149. The fitness aspect of the test "safeguards against hypothetical or speculative disagreements." *Nebraska Public Power Dist. v. MidAmerican Energy Co., 234 F.3d 1032*, 1038 (8th Cir. 2000).

Here, the fitness prong of the ripeness analysis is implicated because Kilgore raises a speculative argument—that is, under current DOC policy it is *possible* that he could be disciplined for engaging in NGE activity like studying his texts and building with other individuals. *See* ECF

No. 39, Ex. B ("As STG activity and paraphernalia threaten the security of the facility, all such behavior and items are prohibited. Possession of any clothing or property associated with an STG, or any communication or actions related to STG affiliation, is prohibited and may result in discipline"). Yet, Kilgore has not argued or put forth any evidence that he has, in actuality, been disciplined in some way for NGE activities. The DOC offered Kilgore the central texts, which he initially refused. Similarly, the DOC has indicated that Kilgore is free to meet with non-offender NGE members through normal visitation, which could include meetings with spiritual advisors.

The Court recognizes the apparent contradiction facing Kilgore, in that the DOC states that it is allowing Kilgore to engage in NGE activity, but yet DOC policy 301.110 simultaneously labels that activity as STG related (which could result in discipline). However, the Court declines to speculate on how prison officials will react if Kilgore follows through with the DOC's attempted accommodations, such as possessing and studying the central texts and meeting with non-offending NGE members through normal visitation. *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."). The claim that Kilgore may be disciplined for NGE activities is not ripe at this time; to the extent Kilgore argues that this potential discipline violates his first Amendment right to Free Exercise, the claim should be dismissed.

In sum, Kilgore has failed to sufficiently show that the DOC's STG designation substantially burdens the practice of his NGE religion. Because this threshold showing of substantial burden was not realized, the Court need not address the *Turner* factors. No genuine issue of materially fact remains and Defendants are entitled to summary judgment on Kilgore's Free Exercise First Amendment claim.

**D. Qualified Immunity.**

The doctrine of qualified immunity protects government actors from personal liability under a § 1983 claim "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The "driving force" behind the creation of the doctrine was to eliminate insubstantial claims against government officials prior to discovery. *Anderson v. Crieghton*, 483 U.S. 635, 640 n.2 (1987).

Two questions are considered to determine whether officials are protected by qualified immunity: (1) whether the facts alleged, viewed in the plaintiff's favor, support a finding that the conduct of the defendants violated a constitutional right; and (2) whether that constitutional right was "clearly established" at the time of the incident such that a reasonable officer would have known that his or her actions were unlawful. *Pearson*, 555 U.S. at 232. The order in which the qualified immunity prongs are addressed is left to this Court's discretion. *Id*. at. 236. "Qualified immunity is appropriate only if no reasonable fact-finder could answer yes to both of these questions." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009).

As discussed above, the Court finds that Defendants did not violate Kilgore's First Amendment Free Exercise right as it pertains to the STG designation and therefore there is no need for the Court to evaluate whether the constitutional right was clearly established at the time of the alleged violation. *See Fields v. Abbott*, 652 F.3d 886, 894 (8th Cir. 2011) (stating that, having found Defendants did not violate Plaintiff's constitutional rights, the Court need not address the other prong of the qualified immunity analysis–whether the constitutional right at issue was clearly established) (citing *Avalos v. City of Glenwood*, 382 F.3d 792, 801 (8th Cir. 2004)).

## IV. CONCLUSION

For the reasons set forth above, Kilgore has failed to establish that his right to freely exercise his NGE religion was substantially burdened, with no genuine issue of material fact remaining on this issue. Thus, Kilgore's individual capacity First Amendment claim fails as a matter of law and Defendants are entitled to summary judgment.

## V. RECOMMENDATION

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

A. Plaintiff's motion for summary judgment [ECF No. 18] be **DENIED**;

B. Defendants' motion for summary judgment [ECF No. 35] be **GRANTED**;

C. Plaintiff's claim against Defendants in their individual capacities for violation of the First Amendment's Free Exercise Clause be **DISMISSED with prejudice** insofar as Kilgore argues that the STG designation prevents him from obtaining central texts, being sent periodicals, and engaging in Parliament activities; and

D. Plaintiff's claim against Defendants in their individual capacities for violation of RLUIPA be **DISMISSED with prejudice**.

DATED: August 8,2014

*s/Franklin L. Noel*
FRANKLIN L. NOEL
United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **August 22, 2014**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.